UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK CASHMAN, and )
CIRO AIELLO; individually and on )
behalf all others similarly situated, )
)
Plaintiffs, )
)
v. )
)
MENU FOODS MIDWEST ) Case No.
CORPORATION, MENU FOODS )
INCOME FUND, MENU FOODS )
LIMITED, MENU FOODS INC., )
MENU FOODS HOLDINGS, INC., )
THE PROCTER & GAMBLE )
COMPANY, THE IAMS COMPANY, )
CHEMNUTRA INC., and JOHN )
DOES 1 through 100, )
)
Defendants. )

APR 23 2007

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Mark Cashman and Ciro Aiello, through their attorneys, individually and on behalf of all others similarly situated, alleges as follows:

### INTRODUCTION

1. This is a class action lawsuit brought by plaintiffs on behalf of themselves and others similarly situated who purchased contaminated pet food and pet food products produced, manufactured and/or distributed by defendants that caused injury, illness and/or death to their household pets.

## PARTIES

### Plaintiffs

2.  Plaintiff, Mark Cashman, a resident of Westchester County, New York, unwittingly purchased and fed his cat "George" contaminated pet food products, including the "Iams" brand pet foods, produced, manufactured and/or distributed by defendants. As a result of consuming the contaminated pet food, George, a cat with years of average life expectancy remaining, became ill and died on February 6th of this year. George had consumed Iams pouches of Adult with Beef and Gravy, Turkey in Gravy, Chicken in Gravy and flakes with Salmon, all products that were produced, manufactured and/or distributed by defendants.

3.  Plaintiff, Ciro Aiello, a resident of Suffolk County, New York, unwittingly purchased and fed his cat "Allie" contaminated pet food products, including the "Iams" brand pet foods, produced, manufactured and/or distributed by defendants. As a result of consuming the contaminated pet food, Allie became ill and died on April 14th of this year. Allie had consumed Iams Select Bites Tuna in Sauce and Select Bites Salmon in Sauce, both products that were produced, manufactured and/or distributed by defendants.

### Defendant Menu Foods

4.  Defendant Menu Foods Income Fund (hereinafter, the "Fund") is an unincorporated open-ended trust created in the year 2002, with its principal place of business in Streetsville, Ontario, Canada.

5.  The Fund owns and controls Defendant Menu Foods Limited (hereinafter "Limited"), a Canadian company with its offices in Mississauga, Ontario.

6. Defendant Limited owns and controls Defendant Menu Foods Holdings, Inc. (hereinafter "Holdings"), a corporation organized under the laws of the State of Delaware.

7. Holdings, through its subsidiaries, Defendant Menu Foods Midwest Corporation, a Delaware corporation with its headquarters in Emporia, Kansas, and Defendant Menu Foods Inc., a New Jersey corporation with its headquarters in Pennsauken, New Jersey, claims to be the leading North American private-label manufacturer of so-called wet pet food products, which are sold by supermarket retailers, mass merchandisers, pet specialty retailers and other retail and wholesale outlets. Said Defendants caused the Iams products at issue to be made for Defendants The Procter & Gamble Company and The Iams Company.

8. The actions of defendants, Fund, Limited, alleged herein were undertaken on behalf of itself and each of these Menu Foods entities, who acted as agents for each other when perpetrating the conduct herein alleged and who do business under the name "Menu Foods."

9. Defendants, Fund, Limited, and Holdings along with Menu Foods Midwest Corporation and Menu Foods, Inc. are hereinafter referred to collectively as Defendant "Menu Foods."

10. Defendant Menu Foods individually and collectively caused contaminated pet food and pet food products to be placed in the stream of commerce in the State of New York and in the United States.

**Other Defendants**

11.   Defendant, the Procter & Gamble Company ("P&G"), which acquired, and does business as The Iams Company, is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

12.   Defendant, the Iams Company ("Iams") is a corporation with its principle place of business in the State of Ohio, and is owned by P&G.

13.   P&G and Iams (collectively, "the P&G Defendants") caused their brands of pet food, including Iams® brand self-styled premium pet foods, to be manufactured, marketed, distributed and sold to consumers including Plaintiffs, in New York and throughout the United States.

14.   Menu Foods makes the Iams® brand pet food products at issue for the P&G Defendants.

15.   Defendant ChemNutra Inc. is a Delaware corporation with its principal place of business in Las Vegas, Nevada. ChemNutra purports to import "…quality ingredients to the U.S. for the feed, food and pharma industries…," to deliver "…high-quality chemicals and ingredients from quality-assured manufacturers in China," and to "specialize" in "Vital Wheat Gluten".

16.   ChemNutra Inc. imported, supplied and/or distributed to Menu Foods wheat gluten, which the U.S. Food & Drug Administration (FDA) has reported to contain melamine, and which the FDA has identified as one source of the contamination in the pet food recalled by Menu Foods.

17.   The true names and capacities of the Defendants sued in this Complaint as Does 1-100, inclusive, are currently unknown to Plaintiffs, who therefore sue such

Defendants by such fictitious names. Each of the Defendants designated herein as a Doe Defendant is legally responsible in some manner for unlawful acts referred to in this Complaint. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as Doe Defendants when such identities become known.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $5,000,000, exclusive of interests and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(a)(1) because a substantial portion of the acts and transactions constituting the violations of law alleged in this Complaint occurred in this Judicial District.

## SUBSTANTIVE ALLEGATIONS

### Menu Foods and Their Defective Product

20.     Menu Foods makes the food found in about 100 varieties of pet food products.

21.     On March 16, 2007, Menu Foods announced the recall of "cuts and gravy" style pet food in cans and pouches that were manufactured at two of their United States facilities between December 3, 2006, and March 6, 2007. The recall specifically named more than 90 pet food brands that were purchased by Plaintiffs and the other Class

members, including without limitation, Iams brand pet food products, the pet food products at issue in this case (hereinafter, the "Contaminated Pet Food").

22. Simultaneously, Menu Foods announced that the recall dates coincide with the introduction of an ingredient from a new supplier, and that it had received complaints about the impact on the renal health of the pets consuming the Contaminated Pet Food.

23. According to the Company, Menu Foods discontinued using the supplier of the ingredient, which they believed to be attributable to the contamination of pet food products at issue, on March 6, 2007 – ten days prior to announcing the recall.

24. Menu Foods further disclosed that as early as February 20, 2007, almost one month prior to the recall, it reported to the FDA that it received complaints that cats and dogs died or experienced kidney failure as a result of eating the Contaminated Pet Food.

25. Menu Foods received similar telephone complaints long before the recall (some as early as December 2006) from pet owners indicating that their pets became ill from eating some of the recalled products purchased by other class members.

26. Weeks before the recall, Menu Foods, instead of alerting the public, initiated food "tasting trials" resulting in the death of seven of the forty to fifty dogs and cats tested and others becoming sick.

27. Despite such red flags, however, Menu Foods refused to issue a recall of the Contaminated Pet Food until March 16, 2007, and at that time announced only that the recall was purely precautionary, and merely a "proactive step out of an abundance of caution, because the health and well being of pets is paramount to the [Company]."

473546                                                   6

28.     It was not until March 24, 2007, that the Menu Foods Defendants widened the recall to include all of their previously recalled brands manufactured at any time including prior to December 3, 2006.

29.     On April 5, 2007, Menu Foods expanded its recall again to include an even broader range of dates and varieties. In a press release, Menu Foods announced "an expansion of its recall to include all products manufactured with wheat gluten purchased from ChemNutra Inc., which Menu Foods' records show was first used on November 8, 2006 and last used on March 6, 2007."

30.     The recall expansion was announced on the heels of disclosure that Defendant ChemNutra Inc. announced its own recall of wheat gluten it imported from Xuzhou Anying Biologic Technology Development Co. Ltd. located in China.

31.     According to the FDA, ChemNutra Inc. provided the contaminated wheat gluten used in the recalled pet food products and sample testing of the wheat gluten and the products revealed the presence of melamine.

32.     Menu Foods has yet to clarify what substance or combination of substances in its pet food (whether melamine and/or otherwise) has led to the death and illnesses of at least hundreds of companion animals around the nation.

33.     Melamine is a metabolite of cyromazine, a pesticide. Animal studies demonstrate it is toxic and may lead to kidney disease, cancer, or reproductive damage.

34.     In the wake of the unprecedented pet food recall, Menu Foods has nonetheless disclosed that expansion plans for its pet food operations are under consideration, despite quality concerns with their products and the extensive damage they have caused to pet-owning consumers.

35. The delay in issuing the recall and Menu Foods' receipt of complaints about the Contaminated Pet Food as early as December 2006, coincides with the eligibility of the principals, investors and/or trustees of Menu Foods to obtain cash disbursements from the Fund which were only recently unattainable. Due to the Fund's previous debt ratio, it was prohibited from making monthly cash or other distributions, to its members including holders of its Trust Units or Class B Exchangeable Units between December 2005 until September 2006, and to which its members had become accustomed prior to that time. The individuals presiding on the board of trustees of the Fund, and the directors and/or officers of Menu Foods GenPar Limited, which administers the Fund, are investors in Menu Foods and hold such Units.

**Menu Food's Past**

36. This is not the first time that Menu Foods has put their corporate welfare, financial interest, or public image ahead of safety concerns. On May 19, 2004, the FDA issued a Warning Letter to one of the Menu Foods defendants revealing its "significant deviation" from federal regulations pertaining to prohibited animal proteins in ruminant feed. The regulation(s) were intended to prevent the establishment and spread of Bovine Spongiform Encephalopathy ("BSE"). Though the regulation(s) required the use of a cautionary statement regarding BSE, the Menu Foods Defendant introduced the product into interstate commerce in October 2003 without the required statement. (Center for Veterinary Medicine, Fiscal Year 2004 Report.)

37. The Menu Foods violation occurred though in 2003, BSE discovered in the United States and in Canada resulted in the closure of the Mexican and Canadian

borders to United States-made pet food and a temporary suspension of Menu Foods product shipments from its Canadian operations.

38.     Moreover, Menu Foods was aware of the federal regulation pertaining to BSE prior to October 2003. In February 2003, "Menu Foods", as a member of the Board of Directors for the Pet Food Institute, unsuccessfully lobbied the FDA not to adopt the very regulation that it later violated, expressly on grounds that such a cautionary statement on pet food product labels would cause consumer perception regarding product safety to decline and result in economic damage. (Pet Food Institute Letter of February 4, 2003 responding to FDA Notice of Proposed Rulemaking entitled "Substances Prohibited From Use in Animal Food or Feed; Animal Proteins Prohibited in Ruminant Feed.")

**Factual Allegations Related to Plaintiff**

39.     During the time period inclusive of November 2006 to February, 2007, Plaintiff Cashman purchased and "George" consumed regularly the Contaminated Pet Food including some of the Iams products at issue, Iams pouches, Adult with Beef in Gravy, Turkey in Gravy, Chicken in Gravy and Flakes with Salmon.

40.     Plaintiff Cashman purchased the Contaminated Iams Pet Food at a Pathmark Supermarket near his house.

41.     During the time period inclusive of December to March, 2007, Plaintiff Aiello purchased and "Allie" consumed 2-3 times a week the Contaminated Pet Food including some of the Iams products at issue, Iams Select Bites Tuna in Sauce and Select Bites Salmon in Sauce.

42. Plaintiff Aiello purchased the Contaminated Iams Pet Food at a local Stop&Shop store.

43. On February 5, 2007, George was taken to the veterinarian, after showing signs of illness, and blood and urine tests were performed. George's blood work came back and showed Creatine and BUN levels that were extremely high and he was diagnosed with kidney disease/failure. On February 6, 2007 George died from kidney failure, after the veterinarian was unable to save him. George's high Creatine and BUN levels are consistent with reports around the country attributing pet injury and death to the tainted recalled pet food. George, in fact, died because he consumed the Iams products at issue.

44. On March 18, 2007, Allie was taken to the local animal hospital, after showing signs of severe illness, and blood and urine tests were performed. Allie's blood work came back and showed her to be in renal failure. Allie was put on medication, intravenous fluids and given injections, while she stayed at the hospital for three nights. Allie then had to continue to receive sub-cutaneous fluid injections at home every day. Eventually she succumbed to acute renal failure and liver failure. Finally, on April 14, 2007 Allie was euthanized due to kidney failure, after the veterinarian was unable to save her. Allie's diagnosed renal failure is consistent with reports around the country attributing pet injury and death to the tainted recalled pet food. Allie, in fact, died because she consumed the Iams products at issue.

45. Shortly thereafter Menu Foods initiated a recall of the Contaminated Pet Food. Among the various products recalled were the Iams products that plaintiffs fed to George and Allie.

**General Allegations**

46.  The Contaminated Pet Food was defectively designed and produced, and is toxic, poisonous or unreasonably dangerous to pets that consume it. Due to the composition of the products (e.g., the concentration of a tainted wheat gluten ingredient), the products are not usable for their intended purposes, and when used, cause a significant risk of bodily harm, including severe or fatal bodily harm (such as renal or kidney failure, or death) to the pet.

47.  Said defects and inherent dangers existed in the Contaminated Pet Food at the time it left the control of the Defendants, and at the time Plaintiffs and the members of the Class purchased said products (though they could not discover same at the time it was purchased).

48.  Defendants had a duty of care to Plaintiffs and purchasers of the Contaminated Pet Food. Defendants had a duty to design, manufacture, test, market, distribute, label, promote, and sell, a safe product and/or ingredient, and a duty to warn or disclaim any potential dangers which derive from the unreasonable dangers posed by the product and/or ingredient.

49.  As a result of their purchases of the Contaminated Pet Food, as set forth above, plaintiffs and other members of the Class have suffered and will suffer damages, including consequential and incidental damages, such as the loss and disability of their household pets, costs of purchasing the Contaminated Pet Food and replacing it with safe non-contaminated pet food, including sales tax or a similar tax, costs of making an additional trip to a retail store to purchase the safe non-contaminated pet food, the cost of

veterinarians, treatment, medicines and the trip(s) to make such visits for diagnosis and treatment.

## CLASS ACTION ALLEGATIONS

50.  Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of:

> All persons in the United States who purchased or incurred damages by using, pet food produced, manufactured and/or distributed by defendants that was or will be recalled by defendants, including that produced from November 8, 2006 up to and including April 7, 2007 (hereinafter the "Class").

Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants, who will be threatened with injury arising from Defendants' actions as are described more fully herein.

51.  <u>Numerosity</u>: The members of the Class are so numerous and geographically diverse that joinder is impracticable. While the exact number and identities of members of the Class are unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiffs believe and therefore aver that there are thousands of Class members throughout the United States.

52.  <u>Commonality</u>: There are questions of fact and law common to members of the Class that predominate over any questions affecting any individual members including, *inter alia*, the following:

(a)  Whether defendants sold the Products that were recalled or subject to a recall;

(b)  Whether defendants advertised, represented, or held themselves out as producing or manufacturing a pet food product that was safe for the Class members' pets;

473546         12

(c) Whether the P&G Defendants expressly warranted these products;

(d) Whether the P&G Defendants purported to disclaim any express warranty;

(e) Whether defendants the P&G Defendants purported to disclaim any implied warranty;

(f) Whether any limitation on warranty fails to meet its essential purpose;

(g) Whether defendants intended that the Products be purchased by plaintiff, Class members, or others;

(h) Whether defendants intended or foresaw that plaintiff, Class members, or others would feed the Products to their pets;

(i) Whether defendants recalled the Products;

(j) Whether defendants were negligent in manufacturing or processing the Products;

(k) Whether using the Products as intended – to feed their pets – resulted in loss, injury, damage, or damages to the Class;

(l) Whether defendants' negligence proximately caused loss or injury to the Class;

(m) Whether Class members suffered direct losses or damages; and

(n) Whether Class members suffered indirect losses or damages.

53. **Typicality**: Plaintiffs claims are typical of the claims of the other members of the Class in that all such claims arise out of defendants' conduct in manufacturing, producing and entering into the stream of commerce defective pet food

and pet food products, defendants' conduct surrounding the recall of its product, and plaintiff's and Class members' purchase and use of defendants' products. Plaintiffs and other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between plaintiffs' claims and those of the Class.

54.  <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' claims are coextensive with, and not antagonistic to, the claims of the other members of the Class. Plaintiffs are willing and able to vigorously prosecute this action on behalf of the Class, and plaintiffs have retained competent counsel experienced in litigation of this nature.

55.  Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(3) because common questions of law and fact (as identified above) predominate over questions of law and fact affecting individual members of the Class. Indeed, the predominant issue in this action is whether defendants' Products are defective and have caused damages to plaintiff and the Class. Further, separate actions prosecuted by individual Class members Class would be so cost prohibitive as to deny Class members a viable remedy. Certification under Fed. R. Civ. P. 23(b)(3) is appropriate because a class action is superior to the other available methods for the fair and efficient adjudication of this action, and plaintiff envisions no unusual difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### NEGLIGENCE
### (Against All Defendants)

56.  Plaintiffs repeat and re-allege all previous allegations as if set forth in full herein.

57.  Menu Foods manufactured the Contaminated Pet Food and bought one of the known poisonous contaminants that it put in its pet food from ChemNutra Inc.

58.  ChemNutra Inc. sold one of the known contaminants found in the Menu Foods recalled products to Menu Foods.

59.  Defendants Procter and Gamble Company and the Iams Company, produced, distributed, marketed and sold the Contaminated Pet Food under the Iams brand name.

60.  Each of the Defendants breached their respective duties of care to Plaintiffs and the Class by failing to design, manufacture, produce, market, distribute, supply and/or sell pet food products and/or ingredients at issue that are reasonably safe for pet consumption, for their intended purposes, and for purposes that do not injure the users of the products, including their respective aforementioned duties

61.  Defendants' respective breaches of the aforementioned duties in the course of failing to warn, and in designing, making, producing, distributing, supplying, marketing and/or selling the pet food products and/or ingredients at issue, caused Plaintiffs and the Class to suffer actual and compensatory damage.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY
### (Against All Defendants)

62. Plaintiffs repeat and re-allege all previous allegations as if set forth in full herein.

63. Defendants caused the Contaminated Pet Food and/or tainted ingredients therein to be placed into the stream of commerce and sold to Plaintiffs and the Class.

64. Plaintiffs and the Class were damaged as a proximate result of Defendants' conduct.

65. Plaintiffs and the Class could not, and should not have reasonably expected the products at issue to contain poisonous and/or abnormally dangerous ingredient(s).

66. Defendants, as a result of their above-described conduct, are strictly liable to Plaintiffs and said Class members.

## THIRD CAUSE OF ACTION

### BREACH OF EXPRESS AND IMPLIED WARRANTIES
### (Against The P&G Defendants)

67. Plaintiffs repeat and re-allege all previous allegations as if set forth in full herein.

68. The P&G Defendants expressly warranted that their pet food products are pet food, guaranteed, nutritious and/or suitable for consumption.

69. The recalled P&G and Iams products purchased by Plaintiffs and the Class are not in fact pet food, are poisonous, are unfit for consumption, and/or are likely to cause illness or death when consumed.

70. Nor are the recalled P&G and Iams products merchantable or fit for their particular purpose.

71. Had Plaintiffs and other members of the Class known these facts, they would never have purchased the P&G and Iams pet food products at issue.

72. The P&G Defendants breached their respective implied warranties of merchantability and fitness for a particular purpose, and their express warranties, which are part of the basis of the bargain for the purchase of its recalled products.

73. As a proximate result of The P&G Defendants' aforesaid breaches of warranty, Plaintiffs and the Class were damaged.

## FOURTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (As to all Defendants)

74. Plaintiffs repeat and re-allege all previous allegations as if set forth in full herein.

75. The revenues and profits flowing to and retained by Defendants from the sale of the recalled pet food products at issue inured to their benefit.

76. Each of the Defendants unjustly retained gains arising from the sale of said pet food products, which were unsafe for pet consumption and not fit for sale, were less than the product advertised, represented, and purchased and/or were not fit for their ordinary and intended purpose.

77. Defendants' retention of financial gains from the sale of said pet food products has unjustly enriched each of them at the expense of Plaintiffs and the members of each Class, who are entitled to restitution, and disgorgement of the Defendants' respective ill-gotten gains arising from the sale of the products as a result.

78.  Defendants' retention of monies received by virtue of their roles in causing said pet food products to be sold to Plaintiffs and the other class members violates the principles of equity and good conscience.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in the respective Class members' favor and against Defendants, as follows:

- A. That this Court enter an order certifying this action as a class action for the Class defined above, appointing Plaintiffs Cashman and Aiello as class representative for each Class, and appointing Plaintiffs' counsel as class counsel;

- B. That this Court find that the Defendants violated applicable law and are therefore liable under said laws as alleged above;

- C. That this Court declare that Menu Foods acted with reckless disregard for Plaintiffs, members of the Class and their pets.

- D. That Plaintiffs and the members of each Class are entitled to a purchase price refund of the pet food products;

- E. That this Court award to Plaintiffs and the Class damages, including actual, incidental, compensatory, consequential and future damages (e.g., cost of veterinarian bills, medication, cremation and funeral expenses, medical monitoring, and pet food) and/or refunds of the pet food products at issue, with interest, and injunctive relief including medical monitoring relief for affected surviving pets;

- F. That this Court award punitive damages against Menu Foods for Causes of Action for which such damages may be had;

- G. That this Court determine that Defendants were unjustly enriched and award restitution and/or disgorgement of their respective ill-gotten gains;

- H. That this Court require each Defendant to account for all revenues and/or profits improperly received as a result of the aforementioned conduct, enjoin each Defendant from dispersing said monies, and impose a constructive trust on said monies;

- I. That this Court award Plaintiffs' counsel reasonable attorneys' fees and costs; and

J.  That this Court order any other relief as it deems just, equitable, and proper.

## JURY TRIAL DEMAND

Plaintiffs and the Class demand a trial by jury on all matters so triable.

Dated: April 20, 2007

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

Gregory Mark Nespole
Martin E. Restituyo
270 Madison Avenue
New York, NY 10016
Telephone: 212-545-4600
Facsimile: 212-686-0114

473546

19